## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATIONAL WILDLIFE FEDERATION, *et* :
*al.*,                                :
                                      :
        Plaintiffs,                   :
                                      :
    v.                                : Civil Action No. 03-1392 (JR)
                                      :
LES BROWNLEE, Acting Secretary,       :
U.S. Department of the Army,          :
                                      :
        Defendant.                    :

## MEMORANDUM

Plaintiffs, two environmental groups, challenge four nationwide dredge-and-fill permits issued by the Army Corps of Engineers.  Plaintiffs assert that these permits violate the Clean Water Act (CWA), 33 U.S.C. § 1251 et seq.; National Environmental Policy Act (NEPA), 42 U.S.C. § 4331 et seq.; Endangered Species Act (ESA), 16 U.S.C. § 1531 et seq.; and Administrative Procedure Act (APA), 5 U.S.C. § 701 et seq. by allowing development that threatens the endangered Florida panther.  I find that the Corps was obligated under the ESA to consult with the Fish and Wildlife Service (FWS) before issuing these permits.  Since the Corps did not do so, I must grant summary judgment to plaintiffs on this technical point.

## Background

This is the third case before me involving the Florida panther. See Nat'l Wildlife Fed'n v. Norton, 332 F. Supp. 2d 170 (D.D.C. 2004); Nat'l Wildlife Fed'n v. Caldera, No. 00-1031, 2002

WL 628649 (D.D.C. Mar. 26, 2002).  My decisions in those cases
contain additional background information on the plight of the
panther and efforts to protect it.

     The Florida panther, a federally listed endangered
species, is "one of the most endangered large mammals in the
world." A.R., Vol. 3, Doc. #2, at 4-117.  Only 100 or fewer of
these big cats occupy a habitat that stretches across large areas
of south Florida.  Development projects in the region pose a
potential threat to the panther.  Large portions of panther
habitat are on land that cannot be developed without a permit
from the Army Corps of Engineers.  Under the CWA, the Corps is
entrusted with regulating the dredging and filling of wetlands.
The CWA allows the Corps to issue individual site permits after
notice and public hearing. 33 U.S.C. § 1344(a).  To streamline
the permitting process, Congress has allowed the Corps to issue
general nationwide permits (NWPs), renewable every 5 years, for
categories of activities that the Corps finds "are similar in
nature, will cause only minimal adverse environmental effects
when performed separately, and will have only minimal cumulative
adverse effect on the environment." 33 U.S.C. § 1344(e)(1).
Development meeting the conditions of an NWP may proceed without

interaction with the Corps.[1]  The Corps issued the four NWPs
challenged in this litigation in January 2002:

- NWP 12: Utility Lines (including pipelines,
  cables, substations, and access roads).  Up to 1/2
  acre of loss of waters. 67 Fed. Reg. 2,079-80.

- NWP 14: Linear transportation crossings (e.g.,
  highways, railways, trails, airport runways, and
  taxiways).  Up to 1/2 acre loss of waters in non-
  tidal waters and 1/3 acre in non-tidal waters. 67
  Fed. Reg. 2,080-81.

- NWP 39: Residential, commercial, and institutional
  development in non-tidal areas.  Up to 1/2 acre
  loss of waters. 67 Fed. Reg. 2,085-86.

- NWP 40: Agricultural activities in non-tidal
  areas.  Up to 1/2 acre loss of waters.  67 Fed.
  Reg. 2,086-87.

These NWPs are all subject to General Condition 11,
which states that:

> No activity is authorized under any NWP which is likely
> to jeopardize the continued existence of a threatened
> or endangered species . . . Non-federal permittees
> shall notify the District Engineer if any listed
> species . . . might be affected or is in the vicinity
> of the project, . . . and shall not begin work on the

---

[1] Some NWPs contain conditions that themselves require
interaction with the Corps.  For example, as discussed supra, the
challenged NWPs now require that permittees provide advance
notice of construction to the Corps.

- 3 -

> activity until notified by the District Engineer that
> the requirements of the ESA have been satisfied and
> that the activity is authorized.

67 Fed. Reg. 2,090.

Under Section 7 of the ESA, the Corps must develop and carry out a program for the conservation of endangered species such as the panther, 16 U.S.C. § 1536(a)(1) (ESA Section 7(a)(1)). The Corps must also determine "at the earliest possible time" whether any action it takes "may affect" endangered species, and, if the answer is in the affirmative, it must consult with FWS. 50 C.F.R. § 402.14(a); see 16 U.S.C. § 1536(a)(2) (ESA Section 7(a)(2)). Under NEPA, the Corps must produce an environmental impact statement unless it issues a finding of no significant impact (FONSI). 40 C.F.R. § 1508.9; 42 U.S.C. § 4332(C).

When the Corps issued the NWPs challenged here, it issued accompanying Decision Documents that comprised FONSIs for each NWP and found compliance with the ESA and "minimal" environmental impact under the CWA. See A.R. Vol. 1 (Final), Docs. #35, 37, 61, 62. In identical language in each NWP, the Corps noted:

> The issuance or modification of an NWP is based on a
> general assessment of the effects on . . .
> environmental factors that are likely to occur as a
> result of using this NWP. . . . As such, this
> assessment must be speculative or predictive in general
> terms.  Since NWPs authorize activities across the
> nation, projects eligible for NWP authorization may be
> constructed in a wide variety of environmental

> settings.  Therefore, it is difficult to predict all of
> the indirect impacts that may be associated with each
> activity authorized by an NWP . . . . Only the
> reasonably foreseeable direct or indirect effects are
> included in the environmental assessment of this NWP.
> Division and district engineers will impose, as
> necessary, additional conditions on the NWP
> authorization or exercise discretionary authority to
> address locally important factors or to ensure that the
> authorized activity results in no more than minimal
> individual and cumulative adverse effects on the
> aquatic environment.  In any case, adverse effects will
> be controlled by the terms, conditions, and additional
> provisions of the NWP.  For example, Section 7
> consultation will be required for activities that may
> affect endangered species.

E.g., A.R. Vol. 1 (Final), Doc. #35 at 6.  Further addressing

endangered species, the Corps noted that it is engaged in local

efforts to address the needs of these species, that the permit

system provides local flexibility to safeguard endangered

species, and that General Condition 11 ensures the protection of

endangered species.  Id. at 18-20.  The Corps did not consult

with FWS before issuing the NWPs, but plans to consult with FWS

as needed on a site-specific basis.  In general, "the Corps

believes that the procedures currently in place result in proper

coordination under Section 7 of the [ESA] and ensure that

activities authorized by [the NWPs] will not jeopardize the

continued existence of any listed threatened and endangered

species."  Id. at 18-19.

The Corps has made a number of local efforts to protect the panther.[2]  In 2000, the Corps prepared, in conjunction with FWS, the Southwest Florida Environmental Impact Statement, which provides a generalized review of permitting practices, draft general permit review criteria going forward, and a map of panther habitat.  A.R. Vol. 3, Doc. #158.  Also in 2000, the Corps and FWS agreed to final interim Standard Local Operating Procedures for Endangered Species (SLOPES).  A.R. Vol. 3, Doc. #157 (FWS letter presenting agreement), available at http://www.saj.usace.army.mil/permit/Endangered_Species/Panther%20Issues/panther_index.htm.  SLOPES outlines general procedures for ESA Section 7 consultations on dredge-and-fill permits.  It also includes a map, to be periodically updated, showing a panther "consultation area."[3]  Id. at Enclosure 1.  Panthers may be present in this area, and development projects within this area should be "scrutinized to determine if there is a potential for effects to panthers."  Id. at 2.

In August 2003, the Corps announced that it was adopting a "Florida Panther Key" to be used as an interim tool (until FWS produced a newer regulatory tool then under

---

[2] The amicus brief of the Association of Florida Community Developers, Inc. provides extensive information on other federal, state, local, and private conservation efforts.

[3] No official critical habitat designation has been made under the ESA for the Florida panther. See 16 U.S.C. § 1533(a)(3).

development) to determine whether ESA Section 7 consultation is necessary for a given project.  See Implementation of a Panther Key and a Proposed Additional Regional Condition to Nationwide Permits 12, 14, 39 and 40, http://www.saj.usace.army.mil/permit/ Endangered_Species/Panther%20Issues/Panther_Key.pdf.  The key combines the SLOPES map with a decisional tree.  For example, a proposed project located more than two miles from a previously observed panther location[4] and more than one mile from land "suitable for panther dispersal" would be deemed to have "no effect" on panthers.  Id.  This key was not subjected to public comment.[5]

The Corps has also supplemented the challenged NWPs to protect panther habitat.  In May 2002, the Corps supplemented NWPs 14 and 39 to exclude any activity in the Belle Meade and Golden Gate Estates areas.  A.R. Vol. 3, Docs. #139a, 139c.  In June 2004, the Corps supplemented all four challenged NWPs to require that anyone planning to use these NWPs in the panther consultation area must provide advance notice to the Corps.  See Implementation of an Additional Regional Condition to Nationwide Permits 12, 14, 39 and 40, http://www.saj.usace.army.mil/

---

[4] Determined by telemetry observations of radio-collared panthers as well as by locations of road crossing mortalities.

[5] Plaintiffs insist that the key is seriously flawed.  See Pls.' Reply at 24-25.

permit/Endangered_Species/Panther%20Issues/PN%20on%20NWP%20thresh

old%20elimination%20July%202004.pdf.[6]  The Corps proffers that

this requirement, in tandem with other prior policies and

regulations, guarantees that no dredge-and-fill action under the

challenged NWPs may proceed in panther habitat unless it is

approved individually by the Corps. Fed. Def.'s Reply at 8.[7]

In 2000, National Wildlife Federation (the same entity

that is a plaintiff here) and four other environmental groups

sued the Corps under the same statutes presently at issue seeking

"systemic" relief for the Florida panther.  In March 2002, I

dismissed that case based on <u>Lujan v. Nat'l Wildlife Fed'n</u>, 497

U.S. 871 (1990), which precludes federal jurisdiction for suits

seeking broad programmatic relief.  <u>Nat'l Wildlife Fed'n v.

Caldera</u>, No. 00-1031, 2002 WL 628649 (D.D.C. Mar. 26, 2002).  I

noted in my opinion in <u>Caldera</u> that the dismissal was without

prejudice to a future "as applied" contest to the NWPs challenged

in the current litigation.

---

[6] The 2004 supplement and the panther key were both
introduced after the inception of this lawsuit.  It is
appropriate for the Corps to continue to update its panther
protection measures -- and a failure to consider these changes in
this opinion would lead to my considering a moot challenge to a
prior version of the NWPs which no longer exists.

[7] I presume, as I must barring any evidence to contrary,
that developers will comply with the law and seek Corps approval
before proceeding with activities in the panther consultation
area. <u>See</u> <u>U.S. v. Norton</u>, 97 U.S. 164, 168 (1877) ("It is a
presumption of law that officials and citizens obey the law and
do their duty.").

Plaintiffs now sue on four counts alleging that the Corps: 1) violated the ESA by not consulting with FWS before issuing the four NWPs; 2) violated the ESA by not developing or implementing a program to conserve the Florida panther; 3) violated the CWA and the APA by arbitrarily, capriciously, and without required documentation finding that the NWPs have minimal individual and cumulative impact on the environment;[8] and 4) violated NEPA and the APA by arbitrarily, capriciously, and without proper evaluations finding that the NWPs would have no significant impact on the environment.  They seek declaratory relief and injunctive relief designed to correct these alleged violations in so far as they affect the Florida panther. Agripartners, G.P. has intervened as a defendant in this case. The Utility Water Act Group and the Association of Florida Community Developers, Inc. have filed briefs amicus curiae in support of defendants.

At oral arguments on July 12, 2004, I found that plaintiffs have standing to proceed in this case.  Plaintiffs now seek summary judgment on the merits.  Defendants have filed cross motions for summary judgment on the merits and additionally

---

[8] Defendant intervenor Agripartners, G.P. asserts that plaintiffs have no jurisdiction to sue the Corps under the CWA's citizen suit provisions. Def. Agripartners, G.P.'s Mot. Summ. J. at 29-30.  The Corps has not raised this issue itself, and, in the past, appears to have acceded to jurisdiction under the APA in at least one similar suit.  See Defenders of Wildlife v. Ballard, 73 F. Supp. 2d 1094, 1097 (D. Ariz. 1999).

assert that this case should be dismissed as <u>res judicata</u> under <u>Caldera</u>; that plaintiffs have not alleged final agency action under <u>Lujan</u>; and that this case is not ripe.

## Analysis

### Res judicata under Caldera

I dismissed <u>Caldera</u> for lack of subject matter jurisdiction, finding no final agency action under <u>Lujan</u>.  2002 WL 628649, at *1-2.  There was thus no decision on the merits for <u>res judicata</u> purposes, so my <u>Caldera</u> decision does not implicate the claim preclusion prong of <u>res judicata</u>.  <u>NextWave Pers. Communications, Inc. v. FCC</u>, 254 F.3d 130, 143 (D.C. Cir. 2001), <u>aff'd</u>, 537 U.S. 293 (2003).  Nonetheless, under the issue preclusion prong of <u>res judicata</u>, if my earlier decision "actually and necessarily determined" the issues raised in the present litigation, plaintiffs' claims would be barred.  <u>Connors v. Tanoma Mining Co.</u>, 953 F.2d 682, 684 (D.C. Cir. 1992) (citation omitted).  The question here is whether my decision in <u>Caldera</u> necessitates dismissal of the present action under <u>Lujan</u>.  In <u>Caldera</u>, plaintiffs vacillated between challenging specific dredge-and-fill actions and challenging the Corps' overall treatment of the panther under the ESA. 2002 WL 628649, at *2-4.  Because I ultimately found that plaintiffs were seeking inappropriately broad programmatic relief, I dismissed the case for lack of subject matter jurisdiction.  <u>Id.</u>  Here, plaintiffs

make a much more narrowly tailored challenge to the issuance of four NWPs that, as discussed <u>supra</u>, is not barred by <u>Lujan.</u> Plaintiffs concede that they do not raise an "as applied" challenge to any specific dredge-and-fill actions.  7/6/04 Tr. at 148.  Nonetheless, their procedural challenge to the NWPs seeks relief applied only to actions that may affect panther habitat, and it is not barred by my ruling in <u>Caldera.</u>

**Final agency action**

Defendants argue that the issuance of the four NWPs[9] is not "final agency action" as required under the APA. 5 U.S.C. § 704.  Defendants assert that since no dredge-and-fill action in panther habitat can proceed without site-specific Corps approval, this approval, and not the issuance of the NWPs, is what plaintiffs must challenge.

Actions are final for APA[10] purposes when they meet two conditions: "First, the action must mark the 'consummation' of the agency's decisionmaking process -- it must not be of a merely tentative or interlocutory nature.  And second, the action must

---

[9] The decision to issue a finding of no significant impact under NEPA is clearly a final action, since without it, the Corps was obligated to perform an environmental impact statement, which it has not done.  <u>See</u> 40 C.F.R. § 1508.9; 42 U.S.C. § 4332(C).

[10] Because I find that the present challenge meets the APA's standards for final agency action, I do not need to consider whether suits under the ESA's citizen-suit provision, 16 U.S.C. § 1540(g), have a lower (if any) bar to surmount.

be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" Bennett v. Spear, 520 U.S. 154, 177-78 (1997) (citations omitted).  The first criterion is clearly satisfied.  The NWPs were subjected to public notice and comment and were published in the Federal Register as legally effective permits.  See 67 Fed. Reg. 2020. This is more than enough. Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs, 297 F. Supp. 2d 74, 79 (D.D.C. 2003) (NAHB I); Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs, 311 F. Supp. 2d 91, 98 (D.D.C. 2004) (NAHB II).

The second criterion requires slightly more analysis, but is still satisfied by plaintiffs.  See Ohio Valley Envtl. Coalition v. Bulen, No. 03-2281, 2004 WL 1576726, at *7-10 (S.D. W. Va. July 8, 2004), modified in part, 2004 WL 2384841 (Aug. 13. 2004).[11]  It may be that no dredging and filling will take place without Corps approval.  In the absence of an NWP, however, each dredge-and-fill action would require an individual permit with the public (including plaintiffs) having a right to notice and a hearing. 33 U.S.C. § 1344(a).  Issuing an NWP thus has "legal

---

[11] Defendants rely on Judge Leon's opinion in NAHB I for the proposition that NWPs are not final agency action.  However, as Judge Goodwin notes in Ohio Valley Environmental Coalition, Judge Leon's decision "focuses exclusively on the rights and obligations of parties seeking to discharge dredged or fill material.  The court did not consider whether the act of issuing a nationwide permit might be final form the perspective of an entity seeking to prevent such discharge."  2004 WL 1576726, at *7.

consequences" in that it sets legally binding procedures by which dredge-and-fill actions may now take place without the public having any notice that dredge-and-fill activities are even contemplated.  The Corps' response, that informal requests or requests under the Freedom of Information Act provide an adequate substitute for the rights lost, Fed. Def.'s Mot. Summ. J. at 16-17, is unsound.  First, under this scenario, the burden of public notice is improperly shifted.  Second, plaintiffs attest to widespread resistance and delays by the Corps when they have attempted in the past to obtain information on projects in panther habitat.  See Pls.' Reply at 19-20.

Finally, plaintiffs' complaint does not seek the overly broad programmatic relief that was blocked by Lujan.[12]  In Lujan, plaintiffs challenged the Bureau of Land Management's "land withdrawal review program."  497 U.S. at 890.  The Court found "that is not an 'agency action' within the meaning of § 702 [of the APA], much less a "'final agency action' within the meaning of § 704."  Id.  The Court found the "program" to be imprecisely defined:

> The term 'land withdrawal review program' (which as far as we know is not derived from any authoritative text) does not refer to a single BLM order or regulation, or even to a completed universe of particular BLM orders and regulations. It is simply the name by which petitioners have occasionally referred to the

---

[12] The Corps appears to concede this point in its reply brief.  See Fed. Def.'s Reply at 5 n.5.

> continuing (and thus constantly changing) operations of
> the BLM in reviewing withdrawal revocation applications
> and the classifications of public lands and developing
> land use plans as required by the [Federal Land Policy
> and Management Act of 1976].

Id. This did not meet the requirement that a plaintiff "must

direct its attack against some particular 'agency action' that

causes it harm." Id. at 891. However, in the present case,

unlike in Lujan and unlike in Caldera, plaintiffs make a narrowly

tailored claim. They assert that defendants violated four

specific statutes in publishing four specific NWPs in the Federal

Register.

## Ripeness

Ripeness is a doctrine of justiciability that is

designed to "prevent the courts, through avoidance of premature

adjudication, from entangling themselves in abstract

disagreements over administrative policies, and also to protect

the agencies from judicial interference until an administrative

decision has been formalized and its effects felt in a concrete

way by the challenging parties." Abbott Labs. v. Gardner, 387

U.S. 136, 148-149 (1967). To evaluate ripeness, I must balance

the "fitness of the issues for judicial decision" and the

"hardship to the parties of withholding court consideration."

Id. at 149; see Sprint Corp. v. FCC, 331 F.3d 952, 956 (D.C. Cir.

2003) (discussing different formulations of the ripeness

standard). "A person with standing who is injured by a failure

to comply with the NEPA procedure may complain of that failure at the time the failure takes place, for the claim can never get riper." <u>Ohio Forestry Ass'n v. Sierra Club</u> 523 U.S. 726, 737 (1998).[13]

In determining fitness for judicial decision, I first look to whether the issues presented are purely legal, in which case they are "presumptively reviewable." <u>Nat'l Mining Ass'n v. Fowler,</u> 324 F.3d 752, 757 (D.C. Cir. 2003). The claims here are a combination of purely legal procedural challenges and arbitrary and capricious challenges, which are also considered purely legal. <u>Sprint Corp.</u>, 331 F.3d at 956.

I next must consider whether the agency or court will "benefit from a more concrete setting, and whether the agency's action is sufficiently final." <u>Fowler</u>, 324 F.3d at 757 (citation omitted). As discussed above, the agency's action is final here. In some cases, even purely legal issues are not yet ripe until the agency has "crystalized its position." <u>Sprint Corp.</u>, 331 F.3d at 957. For example, in <u>NAHB II</u>, I found that a challenge to a "complex" Corps CWA dredge-and-fill regulation was not ripe

---

[13] In so far as <u>Wyoming Outdoor Council v. U.S. Forest Serv.</u>,165 F.3d 43 (D.C. Cir. 1999), imposes a requirement to analyze the ripeness of NEPA claims in some circumstances, the current case does not match those circumstances. <u>See Laub v. U.S. Dep't of Interior</u>, 342 F.3d 1080, 1090 (9th Cir. 2003) (expanding on <u>Ohio Forestry Association</u> discussion of the ripeness of NEPA procedural challenges and distinguishing <u>Wyoming Outdoor Council</u>). In any case, plaintiffs' claims are ripe under the classic <u>Abbott Laboratories</u> analysis.

because it was not yet clear how specifically the Corps planned to implement its new rule, and analysis would greatly benefit from seeing the regulation "applied to a set of facts." 311 F. Supp. 2d at 98-99. Here, however, the issues are not complex, and the Corps' actions are already clear. The Corps has issued the challenged NEPA finding of no significant impact; the Corps did not consult with FWS before issuing the NWPs; the Corps either has or has not met its obligation under the ESA to implement a program to protect the panther; and the Corps has found that the NWPs will have minimal impact and thus that individual permits are not necessary. Plaintiffs' challenge the legality of these actions already taken. Their asserted right to public participation in the permitting process has already been curtailed. Judicial review will not benefit from further factual development. See Ohio Valley Envtl. Coalition, 2004 WL 1576726, at *7-10 (finding facial challenge to NWP ripe for review); Alaska Ctr. for the Env't v. West, 31 F. Supp. 2d 714, 720 n.6 (D. Alaska) (same).

As to hardship, plaintiffs suffer immediate hardship from the issuance of the challenged NWPs. As discussed above, without the NWPs, plaintiffs would be informed of pending permitting actions and have a chance to lodge their objections. Under the NWPs, this is no longer the case. In finding no significant hardship in Ohio Forestry Association, the Court

noted that the challenged plan "does not give anyone a legal right to cut trees, nor does it abolish anyone's legal authority to object to trees being cut."  523 U.S. at 733.  Further, before any trees could be cut, the government was still required to "permit the public an opportunity to be heard," thus giving the plaintiff "ample opportunity later to bring its legal challenge at a time when harm is more imminent and more certain."  Id. at 734.  The present case is precisely the opposite; analysis of hardship favors plaintiffs.  Applying the Abbott Laboratories factors overall, I find that plaintiffs' claims are ripe for review.

**Legal standards**

I must grant summary judgment if the moving party shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

In order to prevail on a suit for judicial review of final agency action under the APA, a petitioner must demonstrate that the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  7 U.S.C. § 706(2)(A).  When dealing with scientific questions entrusted to agency expertise, as we are here, agency decisions are entitled to "great deference."  W. Va. v. EPA, 362 F.3d 861, 867 (D.C. Cir. 2004) (citation omitted).

- 17 -

## ESA Section 7(a)(1) claim

Under Section 7(a)(1) of the ESA, the Corps must develop and carry out a program for the conservation of endangered species such as the panther.  16 U.S.C. § 1536(a)(1). Plaintiffs' claim that the Corps has not done this.  This same issue was before me in National Wildlife Federation v. Norton, 332 F. Supp. 2d 170 (D.D.C. 2004).  I found that the "review criteria" contained in the Southwest Florida Environmental Impact Statement, A.R. Vol. 3, Doc. #158, satisfied the Corps' obligations under Section 7(a)(1).  332 F. Supp. 2d at 187-88. There is no reason for me to reassess that finding at this time.

## ESA Section 7(a)(2) claim

The Corps must consult with FWS "at the earliest time possible" if any "action" that it takes "may affect" an endangered species.  50 C.F.R. § 402.14(a).  Consultation may be informal or formal, but it is clearly defined and requires specific written exchanges between the Corps and FWS.  See id.; 50 C.F.R. § 402.13.  Agency "action" in this case is broadly defined.  See 50 C.F.R. § 402.02 (defining "action" as "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies").  The Corps does not deny that some activities authorized under the NWPs "may affect" panthers.  Fed. Def.'s Mot. Summ. J. at 43.

Nevertheless, the Corps has not consulted with FWS on the four challenged NWPs.[14]

The Corps argues that while actions covered by NWPs "may affect" panthers, the Corps will evaluate each of these actions individually and will consult with FWS for each specific dredge-and-fill activity that it determines "may affect" panthers.  To support this argument, the Corps points to General Condition 11, SLOPES (developed together with FWS), the 2004 NWP supplements, and other protective measures.  The Corps has a point, but there are several serious problems with this argument. ESA regulations are clear that "[a]ny request for formal consultation may encompass . . . a number of similar individual actions within a given geographical area or a segment of a comprehensive plan.  This does not relieve the Federal agency of the requirements for considering the effects of the action as a whole."  50 C.F.R. § 402.14(c).  This regulation helps avoid the situation found invalid by the Ninth Circuit in Lane County Audubon v. Jamison, 958 F.2d 290 (9th Cir. 1992).  In that case,

_____

[14] The Corps' assertion that it initiated ongoing consultation with FWS in June 1997 on its NWPs, see Fed. Def.'s Mot. Summ. J. at 43, does not cure the problem.  This consultation on its face does not cover the current NWPs, which were issued in 2002.  See A.R. Vol. 1 (ESA Record), Doc. #31 (letter from Corps to FWS dated June 24, 1997 requesting consultation); A.R. Vol. 1 (ESA Record), Doc. #102 (letter from FWS to Corps dated November 24, 1999 confirming start of consultation process).  NWPs last only five years, yet this purported "consultation" has been ongoing for nearly eight years.

the Bureau of Land Management promulgated the "Jamison strategy,"
which selected land for logging consistent with the protection of
the spotted owl.  958 F.2d at 291.  Under this "strategy," the
Bureau submitted individual timber sales for consultation with
FWS, but did not submit the strategy itself.  Id. at 292.  The
court found that the "Jamison strategy" was an "action" under 50
C.F.R. § 402.02 that "may affect" the spotted owl.  Id. at 294.[15]
Similarly in our case, overall consultation for the NWPs is
necessary to avoid piece-meal destruction of panther habitat
through failure to make a cumulative analysis of the program as a
whole.[16]

        The Corps is entitled to deference on its individual
decisions that "actions" "may affect" or may not affect

---

[15] Defendants argue that North Slope Borough v. Andrus, 642
F.2d 589 (D.C. Cir. 1980) provides authority to the contrary.  To
the extent that this is true, I agree with the 9th Circuit's
analysis in Conner v. Burford, 848 F.2d 1441, 1455-57 (9th Cir.
1988), cert. denied sub nom. Sun Exploration & Prod. Co. v.
Lujan, 489 U.S. 1012 (1989), limiting North Slope Borough to
circumstances involving the intricate tension between the Outer
Continental Shelf Lands Act and the ESA -- circumstances not
present in our case.

[16] FWS is required to consider "cumulative" effects when it
engages in a site-specific consultation. See 50 C.F.R.
§ 402.14(f); Nat'l Wildlife Fed'n v. Norton, 332 F. Supp. 2d 170,
177-79 (D.D.C. 2004).  The relationship between that
site-specific consideration and the overall consultation that is
the subject of this suit remains to be worked out, but, from
where this Court sits, it would seem that site-specific
consultations might appropriately cross-reference or incorporate
by reference information developed in an appropriate overall
consultation.

endangered species.  Wyo. Outdoor Council v. Bosworth, 284 F.
Supp. 2d 81, 90 n.9 (D.D.C. 2003).  However, the issue here is
not a factual question of whether an "action" "may affect" the
panther, but a legal question of whether the "action" in question
under the ESA and its regulations is the issuance of the NWP
itself or the authorization to proceed with a dredge-and-fill
project at a specific site.  For the reasons stated above, I
disagree with the Corps' determination.  An agency may be
entitled to deference in interpreting a "statutory scheme [that]
it is entrusted to administer," Chevron U.S.A., Inc. v. Natural
Res. Def. Council, 467 U.S. 837, 844 (1984).  Here, however,
Congress has entrusted administration of the ESA to FWS (as part
of the Department of the Interior), see 16 U.S.C.A. § 1532(15),
not to the Corps, so, while FWS's interpretation of the ESA and
its regulations may be entitled to deference, the Corps'
interpretations are not.  See, e.g., Office of Pers. Mgmt. v.
Fed. Labor Relations Auth., 864 F.2d 165, 171 (D.C. Cir. 1988).

        The Corps has repeatedly emphasized its belief that its
"may affect" decisions are reasonable, and, in any case, are
supported by SLOPES, e.g., Fed. Def.'s Mot. Summ. J. at 43, which
the Corps and FWS developed together.  See A.R. Vol. 3, Doc. #157
(FWS letter presenting SLOPES agreement), available at
http://www.saj.usace.army.mil/permit/Endangered_Species/Panther%2
0Issues/panther_index.htm.  I do not read SLOPES to suggest that

- 21 -

FWS has signed off on the Corps' position on the NWPs.  If the Corps is correct, however, consultation with FWS should involve minimal effort and can be terminated quickly by a short letter from FWS under 50 C.F.R. § 402.13 (providing procedures for informal consultation).  These decisions are entrusted to FWS, however, and not to the Corps.

### NEPA and CWA claims

I have found that the Corps has not complied with its ESA Section 7(a)(2) obligation to consult with FWS.  Consultation with FWS may or may not result in the Corps modifying its NWPs.  However, because the Corps' FONSI and "minimal" impact finding under CWA are closely intertwined with the Corps' Section 7 compliance, I will deny both sides' motions for summary judgment on these claims.

### Conclusion

For the reasons given above, I find that the Corps' failure to consult with FWS on the four challenged NWPs has violated ESA Section 7(a)(2).  The accompanying order accordingly grants declaratory judgment in plaintiffs' favor.  What injunctive relief is appropriate, if any, will be the subject of a hearing to be held hereafter.


                              JAMES ROBERTSON
                         United States District Judge